# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PAUL MANUEL C DE BACA,

      **Plaintiff,**

v.                                                              **No. CIV-15-0565 LAM**

CAROLYN W. COLVIN, Acting Commissioner
of the Social Security Administration,

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's *Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, with Supporting Memorandum* (*Doc. 20*), filed December 21, 2015 (hereinafter "motion").   On March 18, 2016, Defendant filed a response (*Doc. 24*) to Plaintiff's motion and, on April 4, 2016, Plaintiff filed a reply (*Doc. 25*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case.   *See* [*Docs. 4* and *7*].   The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law.   Additionally, the Court has meticulously reviewed and considered the entire administrative record.   [*Doc. 15*].   For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

# I.   Procedural History

On, May 9, 2011, Plaintiff protectively filed applications for Disability Insurance Benefits (hereinafter "DIB") and Supplemental Security Income (hereinafter "SSI"), alleging that he became disabled on March 1, 2011.   [*Doc. 15-7* at 2-3].   On June 3, 2011, Plaintiff stated that he was disabled due to "[e]lbow injury."   [*Doc. 15-8* at 3].   Plaintiff's applications were denied at the initial level on July 28, 2011.   [*Doc. 15-4* at 2-3].   On October 4, 2011, Plaintiff stated that he had additional ongoing conditions that he did not realize he was supposed to disclose on his initial application, listing them as:

> Bilateral eyes - bleeding.   A sense of dust in my eyes and burning sensation, blood shot [sic] eyes.   Had bilateral cataract surgery in 2009 and 2010.   Left cubital tunnel syndrome surgery on both hand and elbow scheduled for 10/4/2011. Depression.   Will be addressed after surgery with doctor.   Left ankle.   High ankle sprain.   Hurts when I sit too long.   Bilateral knees.   Knees lock.   Severe arthritis.   Had several falls with former employer.   Right elbow retains fluid after surgery on 3/23/2011.   Elbow locks up when I lean on right side.   Right wrist severe muscle spasms.   Need strong reading glasses.

*Doc. 15-8* at 46.   His applications were denied at the reconsideration level on February 6, 2012. [*Doc. 15-4* at 4-5].   Plaintiff requested a hearing to review the denials of his applications (*Doc. 15-5* at 15-18), including his statement that he had another operation for his neck scheduled on March 23, 2013 (*id.* at 17).   Administrative Law Judge Ann Farris (hereinafter "ALJ") conducted a hearing on August 21, 2013.   [*Doc. 15-3* at 31-59].   At the hearing, Plaintiff was present, represented by attorney Michelle Baca, and testified.   *Id.* at 33, 37-52.   Vocational Expert (hereinafter "VE") Thomas A. Greiner was also present and testified.   *Id.* at 33, 52-59.

On November 25, 2013, the ALJ issued her decision, finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled through the date of the decision.   *Id.* at 13.   Plaintiff requested that the Appeals Council review the ALJ's decision.   *Id.* at 8.   On Jun 8, 2015, the Appeals Council denied Plaintiff's request for review on the ground that there was

"no reason under our rules to review the [ALJ]'s decision." *Id*. at 2. This decision was the final decision of the Commissioner. On July 1, 2015, Plaintiff filed his complaint in this case. [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted). While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the

substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## III. Applicable Law and Sequential Evaluation Process

For purposes of DIB and SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a). In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. §§404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

4

## IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on February 7, 1960 and was 51 years old on March 1, 2011, the claimed onset of disability date.   [*Doc. 15-7* at 2].   Thus, for the purposes of his disability claims, Plaintiff is considered to be a "person closely approaching advanced age."[1]   The highest level of education that Plaintiff completed was 12th grade, in 1978.   [*Doc. 15-8* at 6].   Prior to his alleged disability, Plaintiff worked approximately 30 years washing and fueling United Parcel Service vehicles.   *Id.* at 4-5.   When he was terminated in 2008, Plaintiff was a "carwash supervisor."   *Id.* at 4.

Plaintiff's medical records include:   Hospital treatment records from the University of New Mexico Hospital for the period from September 29, 2010 through August 24, 2013 (*Doc. 15-10* at 3 through *Doc. 15-11* at 5; *Doc. 15-15* at 4 through *Doc. 15-23* at 24); Treatment records from the University of New Mexico Health Sciences Center for the period from January 15, 2011 through November 14, 2011 (*Doc. 15-12* at 4 through *Doc. 15-13* at 7, 16-43; *Doc. 15-14* at 44-51); Treatment records from the University of New Mexico Hospital Emergency Department dated November 23, 2013 (*Doc. 15-23* at 25-34); Consultative examination report by Valerie Valle, Psy.D. dated January 13, 2012 (*Doc. 15-14* at 52-55); and Physical RFC assessment by Craig Billinghurst, M.D. dated July 28, 2011 (*Doc. 15-13* at 8-13).   Where relevant, Plaintiff's medical records are discussed in more detail below.

---

[1] *See* 20 C.F.R. §§ 404.1563(d) and 416.963(d) (defining a "person closely approaching advanced age" as "age 50-54").

At step one of the five-step evaluation process the ALJ found that Plaintiff "has not engaged in substantial gainful activity since March 1, 2011, the alleged onset date [of his disability]."   [*Doc. 15-3* at 15].   At step two, the ALJ found that Plaintiff has the following severe impairments:   "diabetes mellitus, degenerative disc disease, status-post lumbar fusion,[2] carpal tunnel syndrome, cubital tunnel syndrome, hypertension, depression, and generalized anxiety disorder."   *Id.*   The ALJ also found that Plaintiff's claimed kidney problem was not a "medically determinable impairment" and, therefore, did not consider it in her RFC analysis.   *Id.* at 16.   At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. Part 404, Subpt. P, Appx. 1   (20 C.F.R. §§ 404.1520(d),   404.1525,   404.1526,   416.920(d),   416.925 and 416.926).   *Id.*   The ALJ also found that "[t]he severity of [Plaintiff]'s mental impairment does not meet or medically equal the criteria of listings 12.04 and 12.06."   *Id.* at 17.   In reaching this conclusion, the ALJ found that Plaintiff's mental impairments caused only mild restriction of both his activities of daily living (hereinafter "ADL") and his social functioning, and moderate difficulty with his concentration, persistence or pace.   *Id.*   Therefore, neither the criteria of paragraph B nor the criteria of paragraph C for those listings were satisfied.   *Id.* at 17-18.

---

[2] There is no record evidence that Plaintiff has ever had a lumbar (lower back) fusion.   However, in March 2012, he did have an anterior C5-C6 discectomy and fusion for neck and arm pain.   As indicated by the reference to "C5-C6," this surgery was on the *cervical* (neck) section of Plaintiff's spine.   *See* [*Doc. 15-15* at 19-21].

Before step four, the ALJ determined that Plaintiff had the RFC to:

[P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently reach, handle, finger, and feel.  Moreover, [Plaintiff] retains the ability to perform simple, routine tasks.

*Id.* at 18.   In support of her RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments might be expected to cause some of the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."   *Id*. at 19.

At step four, the ALJ found that Plaintiff "is unable to perform any past relevant work." *Id*. at 23.   At step five, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform."   *Id*. at 24.   This conclusion was based on the VE's testimony that an individual with Plaintiff's RFC would be able to perform the requirements of   representative   occupations   such   as:     automobile-self-service-station   attendant (DOT 915.477-010),[3] which is considered to be a light, semi-skilled job, and bakery worker, conveyor line (DOT 524.687-022) or cotton classer aide (DOT 429.587-010), both of which are considered light, unskilled work.[4]   *Id*. at 54-55.   The ALJ then "determined that the [VE]'s testimony is consistent with the information contained in the [DOT]."[5]   *Id*. at 24.   Therefore, the

---

[3] "DOT" stands for Dictionary of Occupational Titles.

[4]The ALJ rejected the VE's suggestion of call-out operator (DOT 237.367-014) specifically because that job is considered to be sedentary.   [*Doc. 15-3* at 54].

[5] This determination is somewhat perplexing inasmuch as the ALJ incorrectly reported the DOT number for automobile-self-service-station attendant as "9153477-010," instead of 915.477-010, and identified the job of cotton classer aide as "[c]otton classer 8."   *See* [*Doc. 15-3* at 24].

ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from March 1, 2011 to the date of the decision.   *Id*. at 24-25.

## V.   Analysis

Plaintiff makes the following arguments in his motion to reverse or remand: (1) the ALJ's RFC finding is contrary to the evidence and the law (*Doc. 20* at 13-20); (2) the ALJ's failure to include all of Plaintiff's limitations in the RFC renders the VE's testimony unreliable (*id*. at 20-22); and (3) the ALJ erred by not linking her credibility finding to substantial evidence (*id*. at 22-24).   In response, Defendant asserts that "a reasonable person could agree that Plaintiff remained capable of light work" as found by the ALJ (*Doc. 24* at 4), and that the ALJ "gave good reasons" in support of her determination of Plaintiff's credibility (*id*. at 6).   In his reply, Plaintiff contends that the Defendant failed to rebut his challenges to the ALJ's errors with respect to his work functionalities, mental impairments, and credibility.   [*Doc. 25*].

### A.   The ALJ's Decision

The ALJ must base her RFC assessment on all of the relevant evidence in the record, such as medical history, laboratory findings, effects of treatment and symptoms, including pain, reports of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work evaluations, if any. Soc. Sec. Rep. 96-8p at *5.   "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.,* laboratory findings) and nonmedical evidence (*e.g.,* daily activities, observations)."   *Id*. at *7.   The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC assessment must always consider and address medical source opinions.   *Id*.   Because the ALJ must consider the whole record, she is prohibited from

picking and choosing "among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence." *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation and internal quotation marks omitted). When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions. *Hamlin*, 365 F.3d at 1215 (citation omitted).

Plaintiff asserts that the ALJ improperly determined his RFC because she failed to weigh the evidence properly, failed to provide a function-by-function assessment, and failed to consider all of his limitations. [*Doc. 20* at 4]. It does appear that the ALJ largely ignored these requirements, instead briefly considering each alleged impairment at a specific point in time and then labeling it either severe or non-severe. Although the ALJ claimed that she "considered [Plaintiff]'s diabetes mellitus through its effects on other body systems, such as the heart, eyes, kidneys, etc." (*Doc. 15-3* at 16), this statement is boilerplate, and the decision itself is essentially devoid of discussion regarding the combined effects of Plaintiff's conditions (*see id.* at 15-17, 20-22). This is simply not the way the process is supposed to work. Failure to address medical evidence that supports a claimant's testimony or to discuss significantly probative evidence that she rejects constitute a failure by the ALJ to properly support her decision with substantial evidence. *See Grogan*, 399 F.3d at 1266-67. The ALJ summarized each of Plaintiff's claims as follows:

> The claimant alleges he is unable to work due to mental and physical impairments and memory loss. His attorney submitted a letter in which the attorney explained that the claimant has hand pain and deformity, carpal tunnel syndrome, cubital syndrome, hypertension, diabetes, chronic neck and upper extremity pain, degenerative disc disease, and severe depression [*Doc. 15-6* at 2-4]. The claimant testified that he is in pain, but admitted he does not take any pain medications. He testified that he has memory loss and has difficulty performing activities of daily living. He explained that he stays by himself and has no friends. He stated that he naps a lot during the day, has no energy, and is tired all the time. He alleges vision problems as a result of his diabetes and neuropathy in his hands and feet.

> He also testified that he has difficulty using his hands.  He explained that he has neck pain as a result of his degenerative disc disease and has bilateral knee pain. Moreover, the claimant stated that he does not like being in crowds and do [sic] not interact well with others.  In a letter provided by the claimant, he also alleged muscle wasting in both hands and an inability to lift over 10 pounds [*id*. at 31-34]. Finally, the claimant alleges that due to his diabetes, he has vision problems including bleeding in the eyes [*Doc. 15-8* at 57-58].   However, he admit [sic] that the problem only happens when he stops taking his medications, and stated that he can see well enough to drive (Id.).

[*Doc. 15-3* at 19].  The ALJ then found that "[t]he medical evidence of record does not fully support the extent of limitations alleged by [Plaintiff]."  *Id*. at 20.   Regarding his neck and back pain, the ALJ noted that two weeks after his cervical spine surgery in March 2012, Plaintiff "was noted to be doing well" (*id.*, citing *Doc. 15-10* at 4), and that, two months after surgery, he was "doing very well" (*id.*, citing *Doc. 15-10* at 6).   According to the ALJ, Plaintiff's "neck pain seemed to be resolved."   [*Doc. 15-3* at 20].   However, Plaintiff claimed that he had continued neck pain and, fourteen months post-surgery, "reported bilateral shoulder pain and back pain" (*id.*, citing *Doc. 15-22* at 6), and "that he had difficulty lifting his granddaughter and has tenderness and limited range of motion of the left shoulder" (*id.*, citing *Doc. 15-22* at 6).   Following steroid injections in both shoulders, Plaintiff "reported the injections did not help" (*id.*, citing *Doc. 15-22* at 17), and "[h]e had decreased range of motion of both shoulders" (*id.*, citing *Doc. 15-22* at 18).

The ALJ noted that, in March 2011, Plaintiff had undergone surgery on his right arm to treat cubital tunnel syndrome[6] and that, in October 2011, he had surgery on his left arm for both

---

[6] Cubital tunnel syndrome is the second most common peripheral nerve entrapment neuropathy in the upper limb.  It represents a source of considerable discomfort and disability for the patient and, in extreme cases, may progress to loss of function of the hand.  Cubital tunnel syndrome is often misdiagnosed but, when appropriately diagnosed, may be treated surgically or by more conservative means.  http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2599973/ (site last visited June 20, 2016).

cubital tunnel syndrome and carpal tunnel syndrome.[7]   [*Doc. 15-3* at 20].   Although he initially experienced some improvement of his symptoms, Plaintiff "again complain[ed] of bilateral hand pain, and had atrophy and weakness in his hands" in 2013.   *Id.* at 20-21 (citing *Doc. 15-18* at 4).   Although X-rays and nerve conduction studies in April 2013 did indicate problems, the ALJ focused on a single medical note indicating more or less "normal" hand function.   *Id.* at 21 (citing *Doc. 15-18* at 4-5).   This referenced June 2013 examination, by Plaintiff's carpal tunnel surgeon, Deana Mercer, M.D., was specifically directed at his complaint of "incisional numbness" in Plaintiff's elbows, rather than his hand function.   *See* [*Doc. 15-18* at 4].   Dr. Mercer concluded that Plaintiff's exam had "no positive clinical findings or carpal tunnel syndrome" (*id.*) and that his incisional numbness was "normal following surgery" (*id.* at 5).   However, in April 2013, Plaintiff was seen by Sunita M. Rajput, D.O. in the UNM Department of Neurosurgery whose examination was "[p]ositive for numbness [and] weakness" in Plaintiff's hands, and nerve conduction studies revealed moderate bilateral carpal and cubital tunnel syndromes, "affecting the sensory and motor components of the nerves.." [*Doc. 15-20* at 19-20].   This evidence not only supports Plaintiff's claims of hand impairment, it is directly contrary to Dr. Mercer's conclusion, which was reached less than two months later.   Nonetheless, the ALJ did not discuss why she relied on Dr. Mercer's report rather than Dr. Rajput's report.

---

[7] Carpal tunnel syndrome is caused by a pinched nerve in the wrist that causes hand and arm numbness, tingling and other symptoms.   The carpal tunnel is a narrow passageway on the palm side of the wrist that is bound by bones and ligaments.   It protects a main nerve to the hand and the nine tendons that bend the fingers. http://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/basics/definition/con-20030332   (site last visited June 20, 2016).

The ALJ then discussed Plaintiff's diabetes,[8] noting that it was "well-controlled" in March 2012, but "was no longer controlled" by November of that year, when Plaintiff "developed a wound on his fourth toe."   [*Doc. 15-3* at 21].   The wound did not heal on its own, and Plaintiff was hospitalized in January 2013 "with a diabetic foot infection" that eventually healed "with proper wound treatment."[9]   *Id.* (citing *Doc. 15-15* at 5-12).   The ALJ noted that Plaintiff's A1C[10] level was 6.8 in March 2013, and "[h]e had also developed diabetic retinopathy[11] and

---

[8] Diabetes is a disease in which blood glucose (sugar) levels are too high.   Glucose comes from foods. Insulin is a hormone that helps glucose enter cells to give them energy.   With type 1 diabetes, the body does not make insulin.   With type 2 diabetes, which is more common, the body does not make or use insulin well.   Without enough insulin, glucose stays in the blood, which can lead to serious problems over time.   Blood glucose can damage eyes, kidneys, and nerves, and can also cause heart disease, stroke, and even limb amputation.   https://www.nlm.nih.gov/medlineplus/diabetes.html (site last visited June 20, 2016).

[9] The "wound" to which the ALJ refers was actually osteomyelitis of Plaintiff's fourth toe on his right foot. *See* [*Doc. 15-16* at 45-46].   "Osteomyelitis is an infection in a bone," and diabetics may develop this condition if their feet have untreated sores.   Surgery may be required to remove parts of the bone that have died, which is then "followed by strong antibiotics, often delivered intravenously, typically for at least four to six weeks." http://www.mayoclinic.org/diseases-conditions/osteomyelitis/basics/definition/con-20025518 (site last visited June 17, 2016).   Indeed, Plaintiff was hospitalized for six days in January 2013 for osteomyelitis (*Doc. 15-16* at 24-51), and was informed that amputation of his toe was the most likely outcome (*id.* at 38).   Plaintiff chose to try intravenous antibiotic treatment, which was administered daily, at his home, for six weeks.   *Id.* at 22, 38.   Plaintiff also subsequently suffered from diarrhea and stomach pain that was ultimately determined to be caused by clostridium difficile (c. diff), for which he was prescribed yet another antibiotic and pain medication on May 2, 2013. [*Doc. 15-19* at 4, 37; *Doc. 15-20* at 2].   Clostridium difficile is a bacterium that is typically acquired from hospitalization and/or prolonged antibiotic treatment.   https://www.nlm.nih.gov/medlineplus/clostridiumdifficileinfections.html (site last visited June 17, 2016).   Describing Plaintiff's osteomyelitis as a wound that healed with proper treatment significantly understates the condition and its associated complications, especially since this condition is a risk that must always be considered by diabetics and their doctors.   http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4119293/ (site last visited June 23, 2016).

[10] The A1C test indicates a patient's average blood glucose level for the preceding three month period.   A "normal" A1C score is below 5.7 percent.   A score of 5.7 to 6.4 percent indicates pre-diabetes, and a score of 6.5 or higher indicates diabetes.   The goal for many diabetes patients is to keep their blood glucose levels below 7.0. https://www.nlm.nih.gov/medlineplus/a1c.html   (site last visited June 20, 2016).

[11] Diabetic retinopathy is damage caused by diabetes to the tiny blood vessels of the retina, which is the light-sensitive tissue at the back of the eye.   Over time, high blood glucose levels can damage eyes, and diabetic retinopathy is a leading cause of blindness in American adults.   Two other eye problems, cataracts and glaucoma, can also result from diabetes.   https://www.nlm.nih.gov/medlineplus/diabeticeyeproblems.html (site last visited June 20, 2016).

nephropathy [12]."  *Id.* (citing *Doc. 15-19* at 4).  Finally, the ALJ noted that, in May 2013,

Plaintiff's "blood glucose was 440,[13] but he admitted he had been off his medications for a few

months."  *Id.* (citing *Doc. 15-19* at 5).[14]

The ALJ only briefly discussed Plaintiff's high blood pressure, noting that his blood

pressure was 152/93 and "was noted to be intermittently controlled" in March 2013, and that it was

"elevated at 132/104, then 142/86 on recheck" in May 2013.[15]  *Id.* at 21 (citing *Doc. 15-19* at 4).

Because the ALJ found that Plaintiff's "alleged kidney problems" did not constitute a medically

determinable impairment at step two, she did not discuss the medical evidence regarding that

issue.  *Id.* at 16.  With respect to Plaintiff's depression and anxiety disorders, the ALJ noted that

Plaintiff "has never sought or received mental health treatment from a mental health specialist,"

---

[12]  Diabetic nephropathy is damage caused to kidneys by diabetes.  Kidneys can be damaged by blood glucose levels that are too high, and diabetes is the most common cause of kidney failure in the United States. Patients who experience kidney failure will need either dialysis (a blood cleansing process) or a kidney transplant. https://www.nlm.nih.gov/medlineplus/diabetickidneyproblems.html (site last visited June 20, 2016).

[13]  Blood glucose measurements are typically taken by diabetes patients as many as several times per day. These tests indicate the level of glucose in the patient's blood only for the specific point in time that the test is performed and may vary dramatically throughout a day, depending on medications taken, food intake, and other factors.  Thus, they differ from A1C levels, which indicate the average blood glucose level over a period of approximately three months.  The American Diabetes Association suggests that diabetes patients attempt to keep their pre-meal glucose levels between 80 and 130, and their one-to-two-hour post-meal levels at less than 180. Obviously, these guidelines would suggest that Plaintiff's May 2013 glucose level of 440 was significantly abnormal.  http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-your-blood-glucose.html (site last visited June 20, 2016).

[14]  This statement exemplifies the ALJ's superficial and compartmentalized consideration of Plaintiff's many conditions.  Plaintiff had been taken off of his diabetes medication, metformin, in February 2013 *by his doctors* because it was impacting his kidney function, resulting in increased creatinine blood levels.  *See, e.g.,* [*Doc. 15-17* at 32-33; *Doc. 15-19* at 4; *Doc. 15-20* at 35]; *see also* n.19, *infra*.  It was intended that Plaintiff's metformin would be restarted once his kidney function improved.  [*Doc. 15-19* at 4].

[15]  All of these blood pressure readings are significantly above the "normal" ranges defined by the American Heart Association, which are systolic (upper number) of less than 120 and diastolic (lower number) of less than 80. http://www.heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp#.V09uuEbfmb8 (site last visited June 20, 2016).

although his primary care physician has been prescribing "mood-stabilizing medications" for him since 2011.  *Id*. at 21.  The ALJ also considered the January 13, 2012 consultative mental status opinion provided by Valerie Valle, Psy.D. (*Doc. 15-14* at 52-55), noting that "Dr. Valle diagnosed [Plaintiff] with a depressive disorder, not otherwise specified, and gave him a global assessment of functioning score[16] of 62," which the ALJ stated "indicates some mild symptoms of [sic] some difficulty in social, occupational, or school functioning, but generally functioning pretty well."[17] *Id*. at 21-22.

Plaintiff's medical records are a fairly complex jumble of notes, tests, and conclusions regarding his several medical conditions.   However, the ALJ's discussion of them is inappropriately cursory, and "certainly does not demonstrate that she considered all of the evidence."  *Conkle v. Astrue*, 297 F. App'x 803, 806 (10th Cir. 2008) (citation and internal punctuation marks omitted).   As with multiple medications, multiple medical conditions interact with each other, leading to a more complicated scenario than would arise from each considered on their own.   Yet it does not appear that the ALJ considered Plaintiff's medical conditions in any way but separately, and even that consideration was unnecessarily superficial.   As just one

---

[16] The GAF score is a measurement of the clinician's judgment of an individual's psychological, social and occupational functioning, and should not include impairment in functioning due to physical or environmental limitations.   DSM-IV-TR at 32.

[17] Dr. Valle's examination of Plaintiff took place in January 2012.   Therefore, she had no opportunity to review or give her opinion regarding Plaintiff's August 2013 test results that indicate he has fairly significant memory and attention deficits (*Doc. 15-22* at 9-16), and an MRI that showed "[s]evere, patchy white matter T2 hyperintensities, much greater than usually seen at this age" (*id*. at 4-5).   The ALJ noted as much in her decision. [*Doc.15-3* at 22-23].   Apparently, however, the ALJ believed herself competent to determine the impact that the subsequent medical evidence had on Plaintiff's RFC, without the need for any medical source's opinion on that issue, opining that "the evidence of record as a whole supports a finding that [Plaintiff]'s mental impairments do affect his ability to work, though they are not disabling."   *Id*. at 23.

example, the ALJ determined that Plaintiff's "alleged kidney problems" did not constitute a medically determinable impairment because "objective testing showed [his] kidney functions were normal." [*Doc. 15-3* at 16]. As her sole support for this conclusion, the ALJ relied on a cryptic Renal Clinic note made by Roshny A. George, M.D. on March 15, 2013 (*Doc. 15-17* at 15), in which Dr. George first noted that Plaintiff had been referred to the Renal Clinic by his primary care provider for "CKD,"[18] then stated that "[Plaintiff] was found to have normal kidney functions in January of 2013" (*id*). Although Dr. George's clinic note contains a list of many laboratory tests that Plaintiff had been given, it does not include the results of those tests, and also does not identify to which "normal" kidney function values Dr. George referred. *Id*. at 16-17. Immediately before Dr. George's assessment and plan notes, there are some test results labeled "Laboratory Data," but those are neither dated nor accompanied by any evaluative information. *Id*. at 18. Immediately thereafter, Dr. George states that Plaintiff's "creatinine[19] was normal in January so this is AKI[20] with resolving creatinine. His creatinine peaked at 1.5,[21] will repeat

---

[18] CKD is a medical abbreviation for chronic kidney disease. https://www.kidney.org/kidneydisease/aboutc kd (site last visited June 20, 2016).

[19] Creatinine is "a waste product from protein in the diet and from the muscles of the body. Creatinine is removed from the body by the kidneys; as kidney disease progresses, the level of creatinine in the blood increases." - See more at: http://www.diabetes.org/diabetes-basics/common-terms/?loc=superfooter#sthash.htrCM91d.dpuf. (site last visited June 20, 2016).

[20] AKI is a medical abbreviation for acute kidney injury. https://www.kidney.org/kidneydisease/aboutckd (site last visited June 20, 2016). AKI "is generally defined as a sudden but ongoing decrease in kidney function," and some AKI patients are also at risk of CKD after they recover. https://www.kidney.org/news/kidneyCare/fall10/AcuteKidneyInjury (site last visited June 23, 2016).

[21] Normal creatinine blood levels range from 0.7 to 1.3 mg/dL for men. See https://www.nlm.nih.gov/medli neplus/ency/article/003475.htm (site last visited June 20, 2016). However, the lab that performed all of Plaintiff's blood tests, TriCore Reference Laboratories, used a reference range of 0.8 to 1.30 until May 23, 2013, when it began using a new reference range of 0.62 to 1.66 mg/dL. *See* [*Doc. 15-19* at 13].

labs today and expect recovery." *Id*. In fact, Plaintiff's kidney function test values were in nearly constant flux in 2013. In January 2013, Plaintiff did have some "normal" creatinine tests. *See id*. at 23. However, in February 2013, four out of five of his creatinine levels were abnormal and both of his eGFR[22] scores were also abnormal. *See id*. at 23, 34. In March 2013, which is when he was seen by Dr. George, Plaintiff's creatinine and eGFR results were again within the normal ranges. *Id*. at 38-39; [*Doc. 15-20* at 27]. In April, Plaintiff's single creatinine and eGFR results were again abnormal. [*Doc. 15-20* at 40]. Finally, in May 2013, five out of six creatinine and eGFR results were abnormal, and all six glucose levels[23] were abnormal. [*Doc. 15-19* at 13-14, 22, 35-36, 42; *Doc. 15-20* at 10]. The ALJ did not discuss any of these test results or even the well-documented connection between diabetes and kidney disease.[24] She likewise did not discuss the fact that Plaintiff was diagnosed with CKD by his primary care physician, Jason D. Kurland, M.D. *See, e.g.,* [*Doc. 15-19* at 25] (On May 10, 2013, "GFR relatively stable in CKD 3 range").

Across the spectrum of Plaintiff's "severe impairments," the ALJ's discussion simply parrots one or more medical record statements. No analysis is made, and no discussion of the effects on Plaintiff is offered. The mere fact that Plaintiff did not proffer an opinion of his

---

[22]Estimated glomerular filtration rate, or "eGFR," is a calculation based on many factors, including blood creatinine level, that both indicates how well a patient's kidneys are filtering blood and determines a patient's stage of kidney disease. The GFR value is considered to be a more reliable indicator of kidney function than is creatinine level alone. As kidney disease worsens, the GFR score decreases, and a GFR score below 60 for three months or more indicates chronic kidney disease. https://www.kidney.org/atoz/content/gfr (site last visited on June 15, 2016).

[23] Plaintiff's six glucose levels in May averaged nearly 245, which is well above 180, the highest suggested level for diabetics. *See* n.13, *supra*.

[24] "About 1/3 of people with diabetes develop kidney disease, and diabetes is the most common cause of kidney failure." https://www.kidney.org/atoz/atozTopic_Diabetes (site last visited June 20, 2016).

functionality from any of his many treating physicians does not absolve the ALJ of her duty to fully consider the medical evidence. *Grogan*, 399 F.3d at 1262 (ALJ "must consider all relevant medical evidence in making [her] findings," citing *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989)). In fact, the ALJ's decision in this case is so significantly lacking in valid analysis as to provide virtually no benefit whatsoever to this Court. Plaintiff's diabetic retinopathy is dismissed solely on the basis that Plaintiff claimed he could see well enough to drive. [*Doc. 15-3* at 19]. Portions of the opinions of the Disability Determination Services (DDS) doctors, which were the only medical source opinions in the record, were disregarded without any reasonable explanation for doing so. *Id.* at 22-23. For example, the ALJ declined to follow the DDS doctors' findings (*see, e.g., Doc. 15-13* at 10-11) that Plaintiff's RFC includes the following limitations: "no more than occasional kneeling, crouching, crawling, and climbing of ramps and stairs; frequent balancing and stooping; never climb ropes, ladders, or scaffolds; is limited to only frequent reaching, handling, fingering, and feeling; and that he must avoid concentrated exposure to vibrations and hazards," with the general statement that "the evidence of record as a whole does not support the [DDS doctors'] opinion." [*Doc. 15-3* at 22]. Yet the ALJ did not cite any record evidence that Plaintiff was in fact not limited in performance of those functions. It has not been this Court's experience that DDS doctors make a habit of identifying limitations that do not exist. In addition, the ALJ disregarded that portion of the physical RFC opinion of DDS doctor Craig Billinghurst, M.D. that Plaintiff was limited to only "occasional push/pull bilateral [upper extremities]" (*see Doc. 15-13* at 9), by not even mentioning it. The ALJ also deemed Plaintiff's neck pain to be "resolved" simply because he was reportedly "doing very well" shortly after neck-surgery and, although subsequent evidence of neck pain is briefly

discussed, that evidence is apparently dismissed.   *Id.* at 20.    Quite simply, the ALJ's decision is not capable of effective review, and remand is therefore the only logical course.

Nonetheless, by remanding this case for further proceedings, "no particular result is dictated" by the Court.   *Thompson v. Sullivan*, 987 F.2d 1482, 1493 (10th Cir. 1993).   Yet this Court emphasizes that, on remand, the ALJ has a duty to develop the record in order "to inform [her]self about facts relevant to h[er] decision and to learn [Plaintiff]'s own version of the facts," even where Plaintiff is represented by counsel.   *Id.* at 1492 (citations and quotation marks omitted).   "Therefore, in addition to discussing the evidence supporting h[er] decision, the ALJ must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects."   *Grogan*, 399 F.3d at 1262 (citation and internal quotation marks omitted).   If there are valid reasons for the ALJ's finding that Plaintiff can perform light work with only minimal limitations, the ALJ certainly should have expressed them and tied them to the evidence of record, making sure to fully discuss all of Plaintiff's medical conditions and the medical evidence about them.    That the ALJ failed to do so is error that clearly warrants remand in this case.

## B.   The Vocational Evidence

Plaintiff claims that the ALJ failed to include limitations in his RFC that were supported by the evidence, and that this failure rendered invalid the VE's testimony about jobs that Plaintiff could perform.   [*Doc. 20* at 20-22].   Because this Court has determined that Plaintiff's case must be remanded for further consideration, it is unnecessary to resolve this issue at this time, since the issue may be affected by the proceedings on remand.   *See Robinson v. Barnhart*, 366 F.3d 1078, 1085 (10th Cir. 2004) (declining to reach the plaintiff's step five claims because they may be affected by resolution of the case on remand); *Lopez v. Astrue*, No. 09-2187, 371 F.App'x. 887,

18

889 and 892 n.6, 2010 WL 1172610 (10th Cir. 2010) (unpublished) (court need not reach claims regarding ALJ's reliance on VE testimony, since such issues may be affected by treatment of the case on remand for further consideration) (citing *Robinson*, 366 F.3d at 1085).   Accordingly, the Court will not address whether the hypothetical posed to the VE was appropriate.

### C.   The ALJ's Credibility Determination

Plaintiff claims that the ALJ's credibility finding is not linked to substantial evidence. [*Doc. 22* at 22-24].   While credibility determinations are considered "peculiarly the province of the finder of fact," such findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."   *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (citations and internal quotation marks omitted).   Thus, an ALJ's credibility determination "cannot be based on an intangible or intuitive notion about an individual's credibility," rather, the "reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision."   Soc. Sec. Rep. 96-7p, 1996 WL 374186, at *4, *see also*, *Bright v. Astrue*, No. 08-1196-MLB, 2009 WL 1580308, at *5 (D. Kan. June 4, 2009) (unpublished) ("findings as to credibility should be closely and affirmatively linked to substantial evidence").   Here, the ALJ's credibility assessment relies on evidence that is superficial, selective, and not particularly relevant to Plaintiff's functionality.   As a result, the assessment appears to be based on intangible factors rather than on evidence, and is more in the nature of a conclusion than a finding.   The superficiality of the credibility determination also warrants remand.

The ALJ discussed some medication issues that she felt indicated that Plaintiff's impairments are not as severe as he claims.   For example, the ALJ noted that Plaintiff "testified that he is in pain, but admitted he does not take any pain medications."   [*Doc. 15-3* at 19].   This

finding is both inaccurate and an unwarranted generalization.   Plaintiff testified that he was not taking pain medication at the time of the hearing, not that he never takes pain medication.   *Id.* at 40.   Moreover, Plaintiff is precluded from taking the most common pain relievers, non-steroidal anti-inflammatory drugs (NSAIDs) due to his renal insufficiency.   [*Doc. 15-22* at 33].   Perhaps if the ALJ had asked him why he was not taking pain medication, she would have learned that fact from him, if not from the medical record.   However, she did not.

The ALJ also indicated that Plaintiff does not always take the drugs that have been prescribed for him.   [*Doc. 15-3* at 22].   However, the medical evidence as a whole indicates a high degree of compliance by Plaintiff with his doctors' orders, although it was undisputed that he struggled to pay for some of his many medications and sometimes had to ask his doctor to change his prescription to something less expensive.   [*Doc. 15-14* at 12; *Doc. 15-20* at 33].   Inability to afford medical treatment can justify a claimant's failure to follow medical advice, and "the ALJ is ordinarily required to address such financial considerations before drawing adverse inferences from the claimant's failure to seek or pursue treatment."   *Alarid v. Colvin*, 590 F. App'x 789, 793 (10th Cir. 2014) (citing Soc. Sec. Rep. 96–7p, 1996 WL 374186, at \*7-\*8 (1996)).   Here, the ALJ did not discuss whether, or how, Plaintiff's financial situation had impacted his ability to comply with his doctors' prescribed treatments.   The ALJ also suggested that Plaintiff's failure to take his diabetes medication, metformin, in May 2013 was the reason for his high glucose levels at that time.   [*Doc. 15-3* at 21-22].   However, the treatment records clearly indicate that Dr. Kurland had discontinued that medication in February 2013 due to the effect it was having on Plaintiff's kidney function.   [*Doc. 15-17-* at 32-33].   This fact is simply one of many that demonstrate the delicate balance that doctors treating diabetics routinely struggle to achieve.   Recognizing the impact that discontinuation of metformin was having on Plaintiff's blood sugar, Dr. Kurland

indicated that the metformin would be restarted once Plaintiff's kidney function improved. [*Doc. 15-19* at 4]  Thus, Plaintiff's "failure" to take prescribed medications was not properly considered by the ALJ to indicate that Plaintiff lacked credibility regarding his symptoms.

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for further proceedings, including proper consideration of Plaintiff's medical conditions and the credibility of his subjective reports of the effects on him of his impairments.

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion to Reverse and Remand for Payment of Benefits, or in the alternative, for Rehearing, with Supporting Memorandum (Doc. 20)* is **GRANTED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_Lourdes a. Martinez_
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**